UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

7018 SEP 28   PM 12: 35

U.S. DISTRICT COURT
DISTRICT OF MASS.

CHARLES DOUCETTE,
          PLAINTIFF.


                                   CIVIL ACTION NO. _____


PAUL TRESELER, CHAIRMAN, MASS. PAROLE BOARD;
CHARLENE BONNER, MEMBER, MASS. PAROLE BOARD;
TONOMEY COLEMAN, MEMBER, MASS. PAROLE BOARD;
SHEILA DUPRE, MEMBER, MASS. PAROLE BOARD;
TINA HURLEY, MEMBER, MASS. PAROLE BOARD; AND
LUCY M. SOTO-ABBE, MEMBER, MASS. PAROLE BOARD;
                                        DEFENDANTS.


## ORIGINAL COMPLAINT

      Plaintiff Charles Doucette, brings this action against

Defendants, and each of them, for the deprivation, and violation

of his rights secured by the Constitution and Laws of the United

States and alleges as follows:


## INTRODUCTION

1.   This civil rights action seeks a new, fair and impartial

hearing for Charles Doucette before the Massachusetts parole

Board. Mr. Doucette seeks such hearing where he claims that

his March 23, 2017 parole hearing, the decision-making process,

and hearing decision were unconstitutionally arbitrary,

impermissibly tainted with bias, and conducted in violation of

his rights under the First and Fourteenth Amendment to the

United States Constitution. Specifically, herein Mr. Doucette

alleges that, among other due process violations at the said

hearing, the defendants: considered/relied upon unconstitutionally

                                1

impermissible evidence to deny parole release, namely Mr. Doucette's exercise of his Constitutional Right to legal redress through the courts; misrepresented to Mr. Doucette's detriment, his history immediately prior to the commission of his governing offense; rendered a decision that misrepresented the facts of Mr. Doucette's governing offense within his plea colloquy and his history on parole; and at the said hearing and in the decision-making process, in violation of the First Amendment, retaliated against Mr. Doucette (by denying him parole) for exercising his Constitutional right to file non-frivilous civil litigation against parole board members and other persons. Despite overwhelming evidence of positive future behavior of Mr. Doucette, defendant's decision was not based on a fair and accurate assessment of the facts presented, depriving Mr. Doucette of due process and of the fair hearing he was entitled to under M.G.L. c. 127, § 133A, in violation of the Fourteenth Amendment to the United States Constitution. Further, the former Chairman of the parole board (and former superior of the current chairman along with four current board members) made public, recorded statements indicating bias against Mr. Doucette, and statements made by four of the defendants at the hearing indicate a continued bias against Mr. Doucette for exercise of the Constitutional Right to legal redress. Mr. Doucette asserts that defendants stated reasons for denial of parole (based upon misrepresentation of facts) amounts to nothing more than a pretext for the defendants

bias, and retaliation for his exercise of his Constitutional Rights.

## JURISDICTION AND VENUE

2.   This case arises under the laws of the United States, 42 U.S.C. §§ 1983 and 1988.

3.   This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

4.   Venue is proper in this District under 28 U.S.C. § 1391 (b) because the events giving rise to Mr. Doucette's claims occurred within the District of Massachusetts.


## PARTIES

5.   Plaintiff, Charles Doucette, is a citizen of Massachusetts and the United States and a state prisoner incarcerated at the Massachusetts Correctional Institution ("MCI") Concord, 965 Elm Street, P.O. Box 9106, Concord MA 01742.

6.   The Massachusetts Parole Board ("the Board") is the state agency granted the authority to make parole determin- ations pursuant to M.G.L. c.c. 27 § 5; 127 §§ 130, 133A. Defendants are current members of the Board ('Board Members"). In their official capacity, acting under the color of state law, defendants conducted the hearing, participated in decision- making process and the written decision challenged by this action, are being sued indiviually in their official capacity.

7.   Defendant Paul Treseler is a voting member and Chairman of the Board, since about December 2014, whose place of business is 12 Mercer Rd., Natick MA 01760.

8.   Defendant Charlene Bonner is a voting member of the Boaed, since about March 2011, whose place of business is 12 Mercer Rd., Natick MA 01760.

9.   Defendant Tonomey Coleman is a voting member of the Board, since about June 2013, whose place of business is 12 Mercer Rd., Natick MA 01760.

10.  Defendant Sheila Dupre is a voting member of the Board, since about October 2011, whose place of business is 12 Mercer Rd., Natick MA 01760.

11.  Defendant Tina Hurley is a voting member of the Board, since about March 2015, whose place of business is 12 Mercer Rd., Natick MA 01760.

12.  Defendant Lucy M. Soto-Abbe is a voting mamber of the Board, since about March 2011, whose place of business is 12 Mercer Rd., Natick MA 01760.

FACTS

Background

13.  On December 3, 1991, Mr. Doucette, after pleading guilty to murder, second degree, and other charges was sentenced to seven (7) concurrent terms of life in prison with parole. He is entitled to a public hearing before the board, which is charged with "render[ing] a fair and impartial decision in his case"; M.G.L. c. 127 § 133A.

14.  After serving 15 years of his sentence, Mr. Doucette, at his initial parole hearing on October 24, 2006, was granted parole. With few exceptions Mr. Doucette had been a model prisoner, engaged in programmong and employment opportunities.

15.  On February 14, 2011, Mr. Doucette was arrested and charged with Assault and Battery with a dangerous weapon, Threats and Intimidation of a Witness. Mr. Doucette was arraigned in the District Court, Salem, Massachusetts Division. The case was then transferred to the District Court, Peabody Massachusetts Division for trial. No indictment was ever sought. These charges arose from an incident where the alleged victim, Mr. Doucette's then girlfriend, whom he had just broken off the relationship, claimed that Mr. Doucette had dragged her down the street with his truck.

16.  The case against Mr. Doucette proceeded to trial in May 2011.

17.  With respect to the alleged victim's claims to police that on February 14, 2011 Mr. Doucette assaulted her by dragging her down the street with his auto, she testified at Mr. Doucette's trial that: "I [the alleged victim] ran along side the car [truck]"..."holding onto his sweatshirt [through the open driver's side window]" and "he [was] not holding onto [me]." And the alleged victim affirmed that she "did not fall before Mr. Doucette drove off"[;] that she "fell a couple of times" "after Mr. Doucette drove off" and that she "had no injuries before" "Mr. Doucette drove off."

18.   Further, as the alleged victim gave testimony the
court stated on the record:"[I]n my own mind, you know, I'm
                           wondering if she, is it real or
                           is she just making this up as she
                           goes along, and I'm wondering ...
                           I know I'm not the factfinder here
                           ... but I'm wondering."

19.   And contrary to the alleged victim's claims to police
on February 14, 2011, and in protions of the alleged victim's
trial testimony, an independent eyewitness to the alleged assault
testified at trial that: "she  watched everything that happened
from her picture window,[and that] [the alleged victim]
went over to his [Mr. Doucette's] truck window. She had a
lot of difficulty doing that ... she was reaching in [the
truck window] like this [gesturing] ... I said [in previous
statement] she [the alleged victim] was hitting him [Mr.
Doucette] because she was going in and out [of the truck
window] with her [arms and] shoulders. ... [And] he left
[drove off]. She went down [on the ground] in the driveway
... [S]he never left the driveway. She couldn't get up. She
kept trying to get up. ... It's embarrassing, but you know
when you watch a drunk, you laugh sometimes. I mean, some-
times it looks funny what's going on. And then ... I felt
kind of bad because she was really having a hard time
getting up ..."

20.   And then the independant eyewitness was questiond as
to why she came forward, she testified:

> "the only reason I got involved
> is because what I saw and what
> I read in the newspaper are two
> completely different things."

21.  At trial Mr. Doucette was found not guilty of all charges
related to the victims accusations on February 14, 2011, where
over the objection of defense counsel, both, the court at jury
selection and the Assistant district Attorney at trial informed
the jury Mr. Doucette was on parole for murder.

22.  On or about March 2011, then Chairman of the Board Josh
Wall appeared on the PBS News Program "Greater Boston" with
a large picture of Mr. Doucette behind him and stated: "this
man should never have been released from prison, we are in
the process of revoking his parole which will give us the
opportunity to put him back in prison for the rest of his life".

23.  As a result of the criminal charges against Mr. Doucette
the Board, including current Defendants Charlene Bonner and
Lucy M. Soto-Abbe, revoked Mr. Doucette's parole and returned him
to prison.

24.  On March 20, 2012, the Board, including current defendants
Charlene Bonner and Sheila Dupre, held a Review Hearing after
Revocation, from which they denied him parole on May 26, 2012,
setting a review date in five years.

25.  On March 23, 2017, the Defendants held the hearing at issue
and rendered a decision denying reparole, which Mr. Doucette
challenges with the instant action.

2017 Parole Hearing

26.  During the hearing defendant Treseler first questioned

7

Mr. Doucette about his litigation against the Board:

| Def. Treseler | "you weren't always so kind about talking about the P.O. [parole officer] correct" |
| Mr. Doucette | "Excuse me" |
| Def. Treseler | "Did you have court filings where you contradict and said things didn't occur that the P.O. said did occur ?" |
| Mr. Doucette | "you'd have to tell ... I don't know" |
| Def. Treseler | "I'll just leave that alone, the record speaks for itself." |
| Mr. Doucette | "Could you please tell me ..." |
| Def. Treseler | "I'm going to leave that alone." |
| Mr. Doucette | "I don't recall the incident." |

27.  Although Mr. Doucette requested to know what matter Defendant Treseler was referring, Mr. Treseler did not inform Mr. Doucette of such matter and moved on to questions on other topics without affording Mr. Doucette an opportunity to present evidence and testimony on the matter that was first and formost on Defendant Treseler's mind in determining Mr. Doucette's suitability for reparole.

28.  Further, in reference to Mr. Doucette's litigation in a matter involving two private citizens, Mr. Treseler asked:

| Def. Treseler | "What do you think it does to those two woman years later that they are now being summonsed into court on a restraining order ? What do you think they feel ?" |

29.  Under the First Amendment to the Constitution of the United States, Mr. Doucette has the right to legal redress, and has this right free of concern that the defendant's will consider

his exercise of said right, and the feel[ings] of litigants
in determining his suitability for reparole.

30. During the hearing Defendant Soto-Abbe also questioned
Mr. Doucette about his filing of motions in the legal case
to which the defendants are not parties, and the Board accepted
for it's consideration in determining Mr. Doucette's suitability
for reparole a copy of the briefs filed in said case.

31. During the hearing Defendant Coleman stated:

> "You managed to get out after fifteen
> years, and you find yourself being charged
> with rape and you beat the case."

32. Contrary to Defendant Coleman's assertion of fact and
portrayal to the other Defendants that Mr. Doucette "beat" a
rape charge, in actuality in 2008 there had been a false accusation
made against Mr. Doucette, a No Bill was returned by a Grand
Jury in this matter; the case was dismissed and the District
Court sealed the record; and the Parole Board Members sitting
at the time did <u>not</u> revoke Mr. Doucette's parole over the
alleged incident.

33. Defendant Coleman asked:

> "Do you think parole should totally
> ignore this incident from 2011 [the
> assault charge] because you were
> acquitted?"

Mr. Doucette
> "Because I was acquitted, No, I was
> acquitted because of what actually
> happened. There is independant eye-
> witness testimony that I didn't do
> what I was accused of doing ... and
> during the trial the victim[] [testified]
> I never hit her."

34.  Defendant Coleman states:

> "The case made it all the way to
> trial. There was probable cause at
> some point."

35.  Defendant Coleman, prior to accepting appointment to the
Board, was an accomplished and experienced criminal defense
lawyer.

36.  Contrary to Defendant Coleman's assertion that because
Mr. Doucette's criminal charges "made it all the way to trial"
based on probable cause, probable cause can, as in Mr. Doucette's
2011 case, be based upon false statements/accusations made to
police by an angry, rejected ex-girlfriend, whose initial
statements were recanted at trial.

37.  Moreover, at the time of the alleged 2011 incident police
did not speak to or seek an available eyewitness who, at trial,
contradicted the alleged victim's account of being assaulted
by Mr. Doucette.

38.  Prior to his reparole hearing, Mr. Doucette provided the
Board Members with a copy of the transcript from his May 2011
criminal trial.

39.  Defendant Coleman's assertion that probable cause equates
to something more than an accusatory allegation of an assault
in determining Mr. Doucette's suitability for reparole violated
Mr. Doucette's right to a fair and impartial hearing and due
process.

40.  During the hearing defendant Dupre questioned Mr. Doucette
about his prior litigation against the defendants:

Def. Dupre          "What is the status of your petition
                    to the Federal Court to null and void
                    your parole revocation?"

Mr. Doucette        "Hmm ?"

Def. Dupre          "Did you file something with ?"

Mr. Doucette        "I dropped everything."

Def. Dupre          "When did you drop it ?"

Mr. Doucette        "A year ago."

Def. Dupre          "And why did you drop it ?"

Mr. Doucette        "After really realizing that I was
                    irresponsible. I accepted something
                    I didn't want to accept, the truth."

Def. Dupre          "So there's nothing pending to null :.
                    and void ?"

Mr. Doucette        "No. I dropped everything."

Def. Dupre          "Why do you feel that your parole
                    revocation should have been null
                    and voided ?"

Mr. Doucette        "From a legal stand point, the
                    irresponsible conduct charges that
                    the Board filed, with [respect to]
                    the person living at my home, not
                    staying at AA meetings, they [the :
                    charges] had been addressed by my
                    P.O. [parole officer], and I was
                    in full complience at the time of
                    my arrest in 2011. I think it's
                    U.S. v. Gaubert [499 U.S. 315]
                    states ...":

Def. Dupre          "I am more interested in your thought
                    process."

Mr. Doucette        "I'm leading to it. I thought with
                    the U.S. Supreme Court Ruling in
                    that case, I thought that my P.O.
                    being an agent of the Parole Board
                    with discretionary power addressed
                    the situations and didn't deem it
                    worthy of revocation and advised me,
                    and I was in complience. In Gaubert
                    it states: When an agent with

> discretionary power makes a decision
> it's conclusive and final. "And then
> to have it brought back up after I was
> in complience, I just figured I had a
> fighting chance to save myself."

41. Central to Doucette's complaint is the import of the descret-
ionary language set out in the Board's controlling agency regulat-
ions:

> "The field parole officer, after review by
> a parole supervisor or other superior
> officer, may submit, in accordance with
> Massachusetts Parole  Board policies, a
> parole violation report to the members
> of the Parole Board when a parolee is
> alleged to have violated one or more
> conditions of parole."

120 CMR 303.02 (1997)(emphasis added).

42. Further, additional support for Doucette's complaint can be
found in the Board's regulations in that:

> "If a parole officer has reasonable belief
> ... that the parolee has violated the con-
> ditions of his parole, the parole officer,
> with consent from a parole supervisor or
> other superior officer, may issue a warrant
> for temporary custody of the parolee. G.L.
> c. 127, § 149.

120 CMR 303.04(1)(emphasis added)

43. Once again in parsing Doucette's complaint the defendants
overlooked or misapprehended the applicable state regulatory
law. Stated otherwise, the said regulations clearly and unequ-
uivocally invest in Doucette's field parole officer, after
review by or with the approval of a supervisor or other superior
officer, the discretion to initiate, or more importantly not
initiate, parole revocation proceedings and/or a warrant for
temporary custody of the parolee. 120 CMR 300.02 and 120 CMR
303.04(1)(1997).

44.   "When established government policy, as expressed or
implied by statute, regulation, or agency guidelines,allows
a government agent to exercise discretion, it must be presumed
that the agent's acts are grounded in policy when exercising
that discretion." United States  v.  Gaubert, 499 U.S. 315,
324-25.(1991).

45.   On information and belief, Doucette's field parole officer's
exercise of her duly authorized discretion in addressing and
remediating Doucette's alleged technical parole violations,
without initiating parole revocation proceedings, stands as
a final judgement binding on the Board. Ibid.

46.   On information and belief, a fortiori, under the foregoing
analysis the doctrine of waiver must apply where the Board's
duly promulgated agency regulations augment the Board's statutory
authority set out in G.L. c. 27 § 5. For those very same reasons
the doctrines of collateral estoppel and res judicata are also
applicable here United States  v.  Gaubert, supra, 499 U.S. at
324-25. see also, Purity Supreme Inc.  v.  Attorney General,
380 Mass. 762, 776 (1980).

47.   On information and belief, parole officers/agents of the
Defendants utilize their discretion on a daily basis in accordance
with the Board's controlling agency regulations to resolve/adjudicate
potential and actual violations of parole conditions by parolees,
such as the plaintiff, without ever initiating parole revocatio
proceedings. - As was the case with this plaintiff when his
parole officer resolved the matters of his attending AA meeting
through their completion; having his landlord's daughter living
in the second floor of his home; and terminating the relationship

13

with his girlfriend.

48.  Def3ndant Dupre's consideration at the hearing and in the decision-making process, demonstrated by Dupre's questioning of Mr. Doucette's exercise of his Constitutional right to redress against the defendants in determining his suitability for reparole is constitutionally impermissible, violating his First Amendment Rights and his rights to a fair hearing and due process.

49.  Defendant Dupre, at the hearing, with evidence presented contrary to her opinions and beliefs, questioned, and expressed doubt of Mr. Doucette's truthfulness in responding to questions about criminal acts she believed he may have committed prior to his governing offense in violation of Mr. Doucette's rights to a fair hearing and due process which infected the hearing and decision-making process with her unfounded biased opinions and beliefs of Mr. Doucette's presumed criminal history. The following is an example of an exchange between Defendant Dupre and Mr. Doucette:

| | |
|---|---|
| Def. Dupre | "And aside from the two home invasions and the murder that you've been affirmed for what other criminal acts had you engaged in that you just weren't cought ?." |
| Mr.Doucette | "Excuse me" |
| Def. Dupre | "You killed Mr. Buffalino ?" |
| Mr. Doucette | "Right" |
| Def. Dupre | "And then you committed two home invasions ?" |
| Mr. Doucette | "Yes" |
| Def. Dupre | "Are we to believe that those are the only criminal acts you committed prior to this incarceration ?" |

| | |
|---|---|
| Mr. Doucette | "I've been in numerous fights." |
| Def. Dupre | "I'm not talking about fights. Have you robbed anybody else, have you pulled a weapon (inaudible) to rob anyone ?" |
| Mr. Doucette | [] "The only other thing that I did that was illegal was when I was working as a doorman; there were patrons in the club that wanted cocaine and I would get that for them. That's the only thing that I can honestly say that I did that was illegal." |
| Def. Dupre | "And your meeting with Mr. Buffalino was to intimidate him. Had you tried to intimidate or sheke down anyone else prior to this murder ?" |
| [] | |
| Def. Dupre | "You used it [firearm] to intimidate him [Mr. Buffalino] ?" |
| Mr. Doucette | "At that point yes I did" |
| Def. Dupre | "And prior to this how many other people had you intimidated ?" |
| Mr.Doucette | "Prior to that nobody I know of. [] you know as far as getting into fights, if thats called intimidation then numerous." |
| Def. Dupre | "It's very hard to believe in a short period of time that you [Mr. Doucette] murder somebody execution style, you fired the weapon twice on that occasion and then you conduct two home invasions, and that was the only criminal conduct that you had prior to your incarceration." |
| | [] "I'm just saying, it's very difficult to believe that the leval of violence you engaged in, in a short period of time, was the only criminal conduct." |

50. Although Mr. Doucette responded to Defendant Dupre's questions at the hearing that he did have a violent past prior to his governing offense, including "numerous fights". Defendant Dupre, upon her expressed belief, did not accept as truthful

Mr. Doucette's testimony that his history of "fighting" was sufficient to escalate into committing a murder and two home invasions, all with a firearm.

## THE WRITTEN DECISION FROM THE HEARING

51. The defendants in their written decision generated from the hearing make statements that are contrary to the record of the hearing. By way of an example, the decision states: "Mr. Doucette acknowledged that he lacked a positive relationship with his parole officer and that he stopped attending the required AA program." Contrary to this statement the record indicates Mr. Doucette testified that:

> "Although I did not alwats see eye to eye with my parole officer, I never lied to her about anything, and it was me [Mr.Doucette] that informed my parole officer that I was attending AA meetings but not always staying for the entire meetings because I was exhausted from working sixteen hour days."

52. By way of an example, the decision states: "Mr. Doucette stated that he was in denial about his addiction, even after receiving 3 DUI's." Contrary to this statement the record indicates that Mr. Doucette made no such statement with respect to 3 DUI's that date to the early 1980's. Mr. Doucette's parole officer stated in the parole violation report ("PVR") dated "02'17'2011" that while on parole:

> "[Mr. Doucette] appeared to abide by parole conditions with attention to sobriety and creating a business, [Mr. Doucette] was in contact with PO as instructed and was available for supervision.... [and] PO [only] advised [Mr. Doucette] that he should consider [ending] the relationship [with his girlfriend] due to her alcohol consumption on occassion (sic) ... The relationship slowed down after PO's constant urging to stop seeing her for his own

benefit. .... [Mr. Doucette] made great strides
in his life. He began a construction business
that took a lot of time and money to get going.
[He] attended counseling per PO's urging to
dael with relationships, decision making and
anger. Throughout parole there was never any
indication of substance abuse."

53.  By way of another example, the decision states: "Board

members expressed concern [at hearing] that Mr. Doucette

shifts responsibility onto other people and minimizes his

criminal activity." This statement is a misrepresentation

of the record. Contrary to this statement Mr. Doucette, at

the hearing testified: "My actions are my actions I take full
responsibility for them today" ... "The
death of Mr. Buffalino kicked off a chain
of events in my life that I truly regret
and when, after I was incarcerated, I
look back on, I wasn't to that leval of
[violence] before the death of Mr. Buffalino.
I would fight with my hands and feet.
I would fight with people all the time.
After the death of Mr. Buffalino I got
myself into a spiral that kept digging
me deeper and deeper into the ground."
... "I take full responsibility for
taking the life of Mr. Buffalino and
for all of my actions after that. I
made decisions. I did that." ... [And
with respect to the two home invasions
he testified] "I was trying to explain
to you how I justified [those crimes]
in my mind years ago. There is no just-
ification for stealing from a drug
dealer, from a murderer, from anybody.
Staeling is stealing, and it's not right.
What I mean by "I'm not a thief", was
before the incident, I was not a thief.
And yes, by committing them [home invasions],
yes, I had to admit I am a thief because
of them incidents. But before that I didn't
steal, I worked for what I needed, I worked
for what my family needed."

54.  The decision states: "The Board [at hearing] expressed

concern regarding Mr. Doucette's criminal activity during

his periods of freedom." During the hearing one or more
defendants questioned Mr. Doucette about alleged criminal
activity while on parole; Mr. Doucette responded by asking
to what activity they were referring. No defendant responded
to Mr. Doucette's request for clarification.

55.  Further, in his administrative appeal, Mr. Doucette
requested clarification as to what alleged "criminal activity"
defendants were referring in their written decision, the
defendants denied Mr. Doucette's request for clarification
stating: "DENIED" (without explanation).

56.  On Mr. Doucette's knowledge only false allegations of
criminal activity have been made against him "during his
periods of freedom"; both such incidents described herein.

57.  The defendants failed to inform Mr. Doucette what
"criminal activity" they were referring to at the hearing
and in their decision, and rely upon their concerns over this
alleged "criminal activity" to deny reparole is a violation
of Mr. doucette's rights to a fair hearing and due process.

58.  In their rationale for denying Mr. Doucette's reparole,
the Defendants decision states: "The Board remains concerned
as to [Mr. Doucette's] attempts to minimize his criminal
culpability, lack of candor, and non-compliance while on
parole supervision." Contrary to this statement the decision
further states: "Mr. Doucette apologized for taking the life
of the [victim] and expressed his remorse. [And] Mr. Doucette
acknowledged that he was a violent person and explained how
he lives with the consequences each day. "Further, as described

herein, Mr. Doucette, based on communication with and advised by his parole officer, was in compliance with parole conditions at the time of his arrest in 2011. The only exception to compliance was his being 30 days late in paying his $80.00 supervision fee - that Mr. Doucette paid after his 02/14/2011 arrest. He was no longer in arrears and, in fact, had paid the following three months supervision fee in advance. Federal case law prohibits the revocation of parole for failing to pay supervision fee - where good cause is shown for failing to do so. [Brown  v. McNeil, 591 F. Supp.2d 1245, 1258-1263 (M.D. Fla. 2008)]

59.   The Defendant's rationale also states: "In addition, [Mr. Doucette] has yet to live up to the recommendations outlined in his last Record of Decision." Contrary to this statement, Mr. Doucette's "last Record of Decision" from 2012 does not "outline" "recommendations"; "his last Recoed of Decision" as far as any "recommendations" states: "continue positive adjustment." Since 2012 Mr. Doucette has continued educational programing and maintained institutional employment including: Violence Reduction-Male - Completed 5/11/12; Computer Skills - Completed 10/9/14; IT Essentials - Completed 3/31/15; TCUD Assessment - Completed 1/27/16; Employment - Maintenance Department, and the Department of Correction's Risk assessment rates Mr. Doucette as : Risk of Violence - Medium; Risk of Recidivism - Low; Cognitive Behavioral - Not considered a needs area for this offender, Criminal Thinking Self Report/Observation - Not considered a needs area for this offender.

60. Pursuant to Legislative Amendments to M.G.L. c. 127,
§ 130,since August 2, 2012, the Board has utilized a risk
and needs assessment tool in determining each parole candidate's
suitability for release on parole.

61. The defendants, pursuant to state law, considered in
determining Mr. Doucette's suitability for reparole, the Risk
and needs Assessment of Mr. Doucette, provided to them by
the Massachusetts Department of Correction.

62. Mr. Doucette, post decision, requested from the defendants
a copy of his Risk and Needs Assessment utilized in determining
his suitability for reparole.

63. Contrary to the Department of Correction's Risk Assessment
rating Mr. Doucette as being a "Low" risk for recidivism, the
Risk and Needs Assessment tool utilized by the defendants rates
Mr. Doucette as having a "Very High" "Programmal Attitude/
Orientation, indicating a very high risk for recidivism.

64. Upon information and belief, the Risk and Needs Assessment
tools utilized by the Department of Correction, and the
Defendants are not an exact science capable of accurately
predicting Mr. Doucette's future behavior.

65. There is a disparity between the Risk and Needs Assessment
conducted by the Department of Correction and the defendants
which, upon information and belief, violates Mr. Doucette's
rights to a fair hearing, decision, and due process.

66. Additionally, defendant's written decision states:
"[Mr. Doucette] has yet to live up to the recommendations
outlinedin his last Record of Decision[,]" and further
states: "the Board encourages Mr. Doucette to continue

20

working towards his full rehabilitation." But no where in
their decision do defendants state or even suggest what
activities or programming Mr. Doucette should/could engage
to "ful[ly] rehabilitat[e]" himself. And further, Defendants
redacted the section(s) of Mr. Doucette's Risk and Needs
Assessment, that on information and belief, would define
for Mr. Doucette what activities/programming he should engage
to ful[ly] rehabilitat[e]" himself.

67. Where defendants critized Mr. Doucette for not "liv[ing]
up to [prior] recommendations" and instructing him to "continue
working towards his full rehabilitation" but did not inform him
of, and intentionally concealed from him, just what activities/
programming he should/could engage in order to become "ful[ly]
rehabilitat[ed]," the Defendants have violated Mr. Doucette's
rights to a fair hearing, decision, and doe process.

68. On information and belief, defendants, inpermissible
consideracion of Mr. Doucette's exercise of Constitutional
rights to legal redress/free speech, is evidence of their
bias against Mr. Doucette in denying him reparole.

69. On information and belief, the volume of defendants
violations of Mr. Doucette's due process rights is evidence
of their bias against him in denying reparole.

70. On information and belief, defendants denied Mr. Doucette
reparole as retaliation for the exercise of his Constitutional
Right to legal redress/free speech; as evidenced at hearing
by defendants stated negative opinions of Mr. Doucette's
exercise of his Constitutional right to legal redress/free speech
against defendants, and members of the public.

## CLAIMS FOR RELIEF

### Count One

Violations of the 1st Amendment to the U.S. Constitution

Legal Redress/Free Speech

71.  Plaintiff incorporates, as if restated herein all allegations set forth in the preceding paragraphs.

72.  Where Defendants negatively considered and retaliated against Mr. Doucette when they relied upon evidence of Mr. Doucette's exercise of his Constitutional right to legal redress/free speech against Parole Board Members and members of the public, they violated his rights under the First Amendment to the United States Constitution in denying him reparole.

73.  The Defendants violation of Mr. Doucette's First Amendment rights under the United States Constitution caused him to suffer irreparable harm, which he continues to suffer today and will continue to suffer until the Defendants hold a reparole hearing where the exercise of Mr. Doucette's Constitutional right to legal redress/free speech is not negatively considered in determining his suitability for reparole.

74,  Mr. Doucette has no adequate remedy at law to redress the irreparable injury Defendants caused and continue to cause him.

### Count Two

Violations to the 14th Amendment to the U.S. Constitution

Due Process

(42 U.S.C. § 1983)

75. Plaintiff incorporates as if restating herein all allegations set forth in the preceding paragraphs.

76. Defendants violated plaintiff's Constitutional due process rights when during his final parole revocation process they: failed to adhere to their own regulations with regard to thier parole officer/agent having the authority/power to resolve/adjudicate potential and actual violations of parole conditions. These due process violations are relevant to this action where during the 2017 hearing Defendants raised the issue of Mr. Doucette's attempts through the courts to "Null and Void" the revocation of his parole.

77. In determining Mr. Doucette's suitability for reparole it was Constitutionally impermissible for defendants to consider Mr. Doucette's exercise of his Constitutional right to legal redress against Parole Board Members, and members of the public, and by such action defendants deprived Mr. Doucette of the fair hearing and decision he was entitled under M.G.L. c. 127 § 133A, in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.

78. Where defendants denied Mr. Doucette a meaningful opportunity to present testimony/evidence with respect to an issue that was foremost on the mind of Def. Treseler, in determining Mr. Doucette's suitability for reparole, they deprived him of the fair hearing he was entitled under M.G. L. c. 127 § 133A, in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.

79. Where defendants accepted into evidence for their consideration in determining Mr. Doucette's suitability for reparole, the briefs in the legal action involving Mr. Doucette and parties other than the current defendants, which should have no relevance on his suitability for reparole, they deprived him of a hearing comporting with the fundamental requirements of fairness, in violation of the due process clause of the Fourteenth Amendment to the United States constitution.

80. Where Defendants, in determining Mr. Doucette's suitability for reparole, misrepresented: (i) his history prior to the commission of his governing offense; (ii) the facts of governing offense within his plea colloquy; and (iii) his history on parole, they deprived him of the fair hearing and decision he is entitled under M.G.L. c. 127 § 133A, in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.

81. Where Defendants, in their written decision, misrepresented: (i) Mr. Doucette's record; (ii) the facts relating to his testimony at his 2017 hearing, they failed to "render a fair and impartial decision" to which Mr. Doucette was entitled under M.G.L. c. 127 § 133A, in violation of his due process rights under the Fourteenth Amendment to the United States Constitution.

82. Where Defendants in their written decision state: "[Mr. Doucette] has yet to live up to the recommendations outlined in his last Record of Decision" and "the Board

encouraged Mr. Doucette to continue working towards his
full rehabilitation," and thereafter in written communication
Mr. Doucette prior to, and in his administrative appeal
requested/argued for defendants to identify what recommendations
(activities/programming) they were referring to, and defendants
failed to respond to such request/arguments, they deprived
Mr. Doucette of "a fair and impartial decision" to which he
was entitled under M.G.L. c. 127 § 133A, in violation of
his due process rights under the Fourteenth Amendment to
the United States Constitution.

83.   Where Mr. Doucette requested from defendants a copy
of his "Risk and Needs Assessment" and defendants provided
him a copy of such document with portions redacted - including
the "Needs" portion they deprived him of fundamental require-
ments of fairness in determining his current and future
suitability for reparole in violation of his due process
rights under the Fourteenth Amendment to the United States
Constitution.

84.   The Defendant's violation of Mr. Doucette's due
process rights under the Fourteenth Amendment to the United
States Constitution caused him to suffer irreparable harm,
which he continues to suffer today and will continue to
suffer until the Defendants hold a new, fair and impartial
hearing, one that is not tainted with bias and arbitrary
decision-making.

85.   Mr. Doucette has no adequate remedy at law to address
the irreparable injury defendants caused and continue to
cause him.

## RELIEF REQUESTED

WHEREFORE, Mr. Doucette requests the Court grant
the following relief:

A.   If it is determined that Defendants violated plaintiff's
Constitutional rights during the final parole revocation
process, plaintiff requests a new, fair final revocation
hearing before an impartial hearing panel that is comprised
of persons other than the Defendants in accordance with M.G.L.
c. 27 § 7, (temporary appointments); alternatively

B.   If it is determined that Defendants did not violate
plaintiff's Constitutional rights during the final revocation
process, but did violate his Constitutional rights during the
2017 review hearing process, plaintiff requests a new, fair
review hearing before an impartial hearing panel that is
comprised of persons other than Defendants in accordance with
M.G.L. c. 27 § 7, (temporary appointment);

C.   Order Defendants to immediately provide discovery in the
form of unrestricted access to Mr. Doucette's complete unredacted
file held by the Massachusetts Parole Board or it's agents, to
enclude, but not limited to, letters, police reports, parole
officer/supervisor reports and all other documents available to
Defendants concerning Mr. Doucette.

D.   Costs of this litigation; and

E.   Any and all other relief deemed appropriate by this Court.

Respectfully Submitted

Charles Doucette, Pro SE
W-51582
MCI Concord
P.O. Box 9106
965 Elm Street
Concord MA 01742

## VERIFICATION

I, Charles Doucette, hereby swear and affirm I am familiar with the facts set out herein; and the samr are true and accurate to the best of my knowledge and belief.

Signed and sworn under the pains and penalties of perjury, this 26th day of September, 2018.

Charles Doucette, Pro Se
W-51582
MCI Concord
P.O. Box 9106
965 Elm Street
Concord MA 01742